UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| CHRISTINE McGINNIS, | | |
| | Plaintiff | DECISION AND ORDER |
| -vs- | | |
| | | 1:19-CV-0862 CJS |
| COMMISSIONER OF SOCIAL SECURITY, | | |
| | Defendant. | |

_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Christine McGinnis for Social Security Disability Insurance ("SSDI") benefits.  Now before the Court is Plaintiff's motion (ECF No. 7) for judgment on the pleadings and Defendant's cross-motion (ECF No. 11) for the same relief.  For the reasons discussed below, Plaintiff's application is denied, Defendant's application is granted, and this action is dismissed.

STANDARDS OF LAW

The Commissioner decides applications for SSDI benefits using a five-step sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.  First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the

1

> regulations [or medically equals a listed impairment].   Assuming the claimant
> does not have a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional capacity [("RFC")] to
> perform his past work.[1]  Finally, if the claimant is unable to perform his past work,
> the Commissioner then determines whether there is other work which the
> claimant could perform.   The claimant bears the burden of proof as to the first
> four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   In relevant part, Section 405(g) states that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir.

---

[1] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also,* 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ["])]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of

3

the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

### FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary for purposes of this Decision and Order.

On August 30, 2016, Plaintiff applied for disability benefits, claiming that she became disabled on August 5, 2016, primarily due to anxiety that caused her to pick at her skin. Plaintiff later amended the disability onset date to February 5, 2017.[2]

Plaintiff has described her condition as follows: "The diagnosis is major depressive disorder and anxiety disorder. . . . [I]f I'm stressed, I get very anxious and I then go into a depressive state. My skin and scalp break out and I itch them, which causes lesions and ulcers on my skin and scalp."[3] Plaintiff has alleged that due to her anxiety and skin condition, she is unable to go out in public.[4] Plaintiff has further indicated that even when she is at home, she often stays in bed all day, is unable to perform many household chores, and is completely unable to cook meals.[5]

---

[2] Administrative Transcript at p. 186.
[3] Administrative Transcript at p. 266.
[4] See, e.g., Administrative Transcript at pp. 208, 228, 231, 235.
[5] Administrative Transcript at pp. 56, 205.

Additionally, Plaintiff claims to experience auditory hallucinations "at least weekly."[6] Plaintiff contends that her auditory hallucinations are a symptom of post-traumatic stress disorder ("PTSD"), and that the voice she hears is "mostly" that of her former supervisor, who "aggressively" fired her.[7]  In that regard, Plaintiff holds a master's degree and previously worked as a staff development coordinator for a Board of Cooperative Educational Services ("BOCES").  In connection with her application for disability benefits, Plaintiff has maintained that she was forced to resign her position at BOCES because, according to her supervisor, people did not want to be around her due to her anxiety and skin lesions.

The Administrative Record as a whole, however, contains evidence that is not entirely consistent with Plaintiff's statements.  For example, the record indicates that during the relevant period of alleged disability Plaintiff left her home multiple times per week and drove herself to have lunch or dinner with family or friends, and that approximately once a month she traveled with her husband to a casino, where she would receive a massage and manicure at the casino spa while her husband gambled.[8]  Plaintiff also reportedly told a therapist that once she was approved for disability benefits she would be interested in performing volunteer work.

As for the alleged auditory hallucinations, Plaintiff stated at the administrative hearing that she had told at least three doctors about them, namely her longtime primary care physician, Sean Stryker, M.D. ("Stryker"), psychiatrist Sampath Neerukonda, M.D. ("Neerukonda") and nurse practitioner Stephanie King, CRNP ("King").[9]  However, the medical

---

[6] Administrative Transcript at p. 54.
[7] Administrative Transcript at pp. 52-53.
[8] Administrative Transcript at pp. 49, 60.
[9] Administrative Transcript at p. 61.

record contains no indication that Plaintiff ever mentioned hallucinations to either Stryker or Neerukonda. Moreover, treatment notes from various other doctors and therapists, including long-time treating psychiatrist Ejiro Agboro-Idahosa, M.D. ("Idahosa") and therapist Cynthia Klinko, LCSW-R ("Klinko"), indicate that Plaintiff expressly denied having any auditory or visual hallucinations. Nor did Plaintiff mention hallucinations during her consultative psychological examination with Amanda Slowik, Psy.D ("Slowik").

As for King, the record indicates that on December 13, 2017, Plaintiff met with a staff member at King's office, to establish a new treating relationship with King, and indicated that she hoped King could help her get "NY state disability retirement,"[10] since her previous psychiatrist, Dr. Idahosa, had refused to help her with her disability claim.[11] Plaintiff stated that in 2015 she began having hallucinations in which deceased in-laws spoke to her, but that the hallucinations were "not scary."[12] In two subsequent notes from King's office, Plaintiff also made references to auditory hallucinations, in which "someone is there and she is talking to them."[13] However, Plaintiff did not tell King that she heard the voice of her former supervisor, nor did she otherwise attribute the hallucinations to the circumstances of her firing in 2016, though she did say that she had nightmares about her former boss.

As for the circumstances surrounding the termination of her employment, as noted

---

[10] Administrative Transcript at p. 366.
[11] Administrative Transcript at p. 366.
[12] Administrative Transcript at p. 364.
[13] Administrative Transcript at pp. 360, 361. Apart from King's office notes, there is one other reference to hallucinations. On October 8, 2015, Plaintiff's daughter reportedly called the office of Plaintiff's then-treating physician, Samodal Rodrigo, M.D. ("Rodrigo") and indicated that Plaintiff was having hallucinations. Administrative Transcript at p. 307. However, just a few days earlier, on October 3, 2015, Plaintiff had expressly denied having "any auditory or visual hallucinations," though she did express the belief that her skin itchiness was being caused by fleas in her home. Administrative Transcript at p. 310.

earlier Plaintiff has consistently indicated, in connection with her disability claim, that her supervisor aggressively either fired her or told her that she needed to resign, specifically because of her skin-picking condition.[14]   However, before she applied for SSDI benefits, Plaintiff told her own therapist that she was fired partly because she had been arrested for shoplifting the previous month: "Last week her boss asked her to resign due to her anxiety + shoplifting back in July [2016]."[15]   Plaintiff also admitted to another therapist that the quality of her work had been slipping for two years before she was fired, during which she had "put off things and just didn't care."[16]

As for her claim of PTSD, Plaintiff has indicated that she suffers from the condition due to the "aggressive" manner in which her supervisor told her that she "needed to resign," and that she is unable to return to work in part due to anxiety resulting from that event.[17] However, Plaintiff also told a mental health therapist that she was enjoying being "retired." *See*, Administrative Transcript at p. 366 ("Retired as a school administrator 7/2017, enjoying retirement.   Prior to this was on a 1 yr administrative leave for whole body hives/rash brought on by her [mental health] symptoms.").

Nevertheless, it appears undisputed that Plaintiff has skin irritation and neurotic

---

[14] For example, a consultative psychologist reported the following: "[S]he was asked to leave by the district superintendent due to sores and hair loss secondary to anxiety.   The claimant asserted that she asked the superintendent whether or not she was being let go because of her attendance or work performance, and he assured her that she was not, but rather that they had received complaints about the sores and hair loss." Administrative Transcript at p. 349; see also, id at p. 360. When pressed at the administrative hearing, Plaintiff indicated that he skin condition was "the main reason" she was terminated by BOCES, though she did not offer any other reason. Administrative Transcript at p. 55.
[15] Administrative Transcript at p. 346.   Plaintiff was arrested in 2016 and 2017 for petit larceny, and in both cases she attributed her conduct to the effects of taking the antidepressant Celexa.
[16] Administrative Transcript at p. 361.
[17] Administrative Transcript at p. 52.

7

excoriation related to anxiety.   The treatment record indicates that Plaintiff's anxiety is primarily related to stressful interpersonal issues in her private life.   Plaintiff has consistently indicated to treating sources that the genesis of her recent acute anxiety (from 2016 onward) was a series of deaths of close family members, including her mother-in-law and sister-in-law.[18]  Plaintiff has also repeatedly indicated that her recent anxiety is directly related to worries about her adult children and tension between herself and her husband, and that her emotional symptoms wax and wane according to how she perceives those familial relationships to be faring at any given moment.[19]   Plaintiff has also indicated that her stress has been exacerbated by her recent legal matters, including two arrests for petit larceny, the denial of her request for disability retirement and the initial denial of her request for her SSDI benefits.[20]   However, as discussed further below, office treatment notes indicate that Plaintiff's mood and skin-picking condition have improved significantly and consistently over time with medication.[21]

On October 12, 2018, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged disability onset date and the date of the decision.[22]   Applying

---

[18] See, e.g., Administrative Transcript at pp. 51, 346, 364, 372, 399-400, 402, 406, 412, 473-478, 480, 484, 490, 493.
[19] See, e.g., Administrative Transcript at p.364 ("Depression is currently well managed with Wellbutrin.   Anxiety is partially managed but is concerned with continued flare ups, also agitation and is very sensitive.   Anxiety is triggered, often by her husband[.]"); see also, id. at p. 437 ("patient is improving as social situation stabilizes"); 477 ("sores healing as marital stress decreases").
[20] See, e.g., Administrative Transcript at pp. 488, 492, 495-497.
[21] See, e.g., Administrative Transcript at pp. 505-507, 510 ("Overall things are going well.   She feels much better than she had. She is happy with her current medication regimen.   The excoriations are improved as well."); 515 ("She states that her anxiety seems to be under good control.   She's not picking at her scabs nearly as much as she used to."); 521, 524, 533 ("She states her anxiety is well controlled.")   Indeed, Plaintiff states that "[s]he has improved but very much has situational anxiety disorder." Pl. Memo of Law, ECF No. 7-1 at p. 6.
[22] The ALJ, the Hon. David Romeo, issued his decision following a hearing at which Plaintiff appeared with her attorney, and at which both Plaintiff and a vocational expert ("VE") testified.

the familiar five-step sequential evaluation set forth earlier, the ALJ found that: Plaintiff had not engaged in substantial gainful activity since the alleged onset date; Plaintiff had severe impairments consisting of generalized anxiety disorder, adjustment disorder with depressed mood, major depressive disorder attention deficit hyperactivity disorder, and neurotic skin excoriations; Plaintiff had other impairments that were not severe, including obesity; Plaintiff's impairments, either singly or in combination, did not meet or medically equal a listed impairment; Plaintiff had the RFC to perform work at all exertional levels, with non-exertional limitations including limitation to "simple" "low pressure" work (work not requiring short deadlines, teamwork, high levels of precision or significant independent judgment) with only occasional interaction with co-workers and supervisors; Plaintiff was not able to perform her past relevant work; but considering Plaintiff's age, education, work experience and RFC, there were other jobs that she could perform.

In making his RFC determination, the ALJ considered statements from five sources concerning Plaintiff's functional abilities.  Of those, the ALJ indicated that he gave the "most weight" to the opinion of Dr. M. Momot-Baker ("Momot-Baker"), a non-examining agency review physician, based on Momot-Baker's "program and professional expertise."[23]  Momot-

---

[23] Plaintiff contends that the ALJ should not have relied on the opinion of "M. Momot-Baker," since it is not clear that Momot-Baker is a doctor.  That is, Plaintiff argues that the ALJ erred in referring to Momot-Baker as "Dr. Momot-Baker" and as a "state agency medical consultant." Administrative Transcript at p. 21. In this regard, as Plaintiff correctly notes, the report by Momot-Baker is signed, "M. Momot-Baker," at a spot designated, "MC/PC or SDM Signature." Administrative Transcript at pp. 72-73, 77, 79. Therefore, it appears from the face of the report that Momot-Baker could be either a medical consultant ("MC"), a psychological consultant ("PC") or a single decision maker ("SDM")., *See Wilson v. Colvin*, No. 14CV5666 DF, 2015 WL 5786451, at *28, n. 103 (S.D.N.Y. Sept. 29, 2015) ("'MC' stands for 'Medical Consultant,' and 'PC' stands for 'Psychological Consultant.' *See* https://secure.ssa.gov/poms.nsf/lnx/0426510089 (last accessed July 1,2015).").  Plaintiff further maintains that a single decision maker is not a doctor, and that the ALJ therefore should not have afforded great weight to Momot-Baker's report, since it is not clear in what capacity Momot-Baker signed the report.  (The Commissioner agrees that the report does not indicate Momot-Baker's professional status, but argues that the Court should find that Momot-Baker is a Ph.D., since "an internet search" shows that Momot-Baker holds that degree. Def. Memo of

Baker indicated that Plaintiff was not disabled, though she had "mild" limitations in activities of daily living and "moderate" limitations in maintaining social functioning, concentration and persistence/pace.[24]   Momot-Baker further stated that Plaintiff would also have "moderate" limitations in remembering, understanding and carrying out detailed instructions; working in close proximity to others; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods.

The ALJ gave "less weight" to the opinion of consultative psychologist Slowik.   Slowik's examination of Plaintiff was almost completely benign, except for finding "mild" impairment in memory testing.   Despite that, Slowik indicated that Plaintiff would have "moderate to marked" limitations in maintaining a regular schedule and dealing with stress; and that she would have "moderate" limitation in relating adequately with others.[25]   The ALJ indicated that he gave "less weight" to Slowik's opinion than to Momot-Baker's, explaining that he generally accepted

---

Law, ECF No. 11-1 at p. 5, n. 2.). However, the Court disagrees with Plaintiff.   Momot-Baker signed the "Disability Determination and Transmittal" form in the spot designated, "Physician or Medical Spec. Name," indicating that Momot-Baker is a doctor. Administrative Transcript at p. 67.   Momot-Baker further indicated that his or her "specialty code" was 38, indicating psychology. *See*, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.   Additionally, the exhibit list, to which Plaintiff and her attorney stipulated at the start of the administrative hearing, indicates that Momot-Baker is a medical doctor. *See*, Administrative Transcript at p. 33 (Identifying Exhibit B2A as a report by "M. Momot-Baker, MD."), 41 (Plaintiff had no objection to the exhibit list).   While Plaintiff now speculates that Momot-Baker may not actually be a doctor, the time to raise that objection was, in the Court's view, at the hearing.   Consequently, the Court finds that Plaintiff waived that objection and that, in any event, Plaintiff has not offered any reason, apart from speculation, to believe that Momot-Baker is not in fact a doctor.   Of course, it would have made much sense if Momot-Baker had expressly indicated his or her degree when signing the report.   Nevertheless, for the reasons indicated, Plaintiff's argument that the ALJ erred in treating Momot-Baker as a doctor lacks merit.
[24] Administrative Transcript at p. 72.
[25] Administrative Transcript at p. 352. Slowik stated that Plaintiff would have unlimited ability to understand and follow simple instructions, and to maintain attention and concentration.

Slowik's opinion, except that he gave "no weight" to Slowik's opinion that Plaintiff would have moderate-to-marked limitations in maintaining a regular schedule and in dealing with stress, since that opinion seemed to be based solely on Plaintiff's "subject report of her functional limitations," and since Plaintiff had showed "little difficulty in being able to attend medical appointments with her treating providers on a regular basis."  Further, the ALJ indicated that same portion of Slowik's opinion seemed inconsistent with Momot-Baker's opinion that Plaintiff "still maintained the ability to meet the basic mental demands of unskilled work even with her psychiatric condition."  The ALJ stated that as between the opinions of Momot-Baker and Slowik, he gave greater weight to Momot-Baker's opinion, since Momot-Baker's opinion was based not only on Slowik's opinion but on "the other evidence of record" from Plaintiff's treating sources.

The ALJ also discussed an opinion from Stryker, Plaintiff's primary care physician, which indicated that Plaintiff "had marked limitation in all areas of her mental function, and that she would be absent from work for three or more days per month."[26]  The ALJ gave "little weight" to the opinion, finding that it had "no support in Dr. Stryker's treating notes."  In that regard, the ALJ indicated that Stryker's notes reported that on one occasion, shortly after Plaintiff was arrested in 2017, Plaintiff appeared very anxious and tearful at an office visit, but that otherwise they show "completely unremarkable" mental status examinations.  The ALJ therefore indicated that Stryker's opinion, that Plaintiff would be absent from work three days per month, was "purely speculative."

The ALJ also considered an opinion from psychiatrist Sampath Neerukonda, M.D.

---

[26] Administrative Transcript at p. 29.

11

("Neerukonda"), who indicated that Plaintiff had marked or extreme limitations in mental functioning, that she would be off task more than 20% of the time during the workday, and that she would be absent from work more than three days per month. The ALJ gave "little weight" to this opinion, finding that there was "nothing of record to support the opinion," including no indication that Neerukonda had ever examined Plaintiff.  Additionally, the ALJ indicated that Neerukonda's opinion was inconsistent both with Momot-Baker's opinion and with the treatment records.

Finally, the ALJ considered a report from therapist Klinko, indicating that Plaintiff had marked limitation in mental function in multiple areas; that she would be off task between 16% and 20% of the workday; and that she would be absent from work three or more days per month.  The ALJ gave "little weight" to the opinion, noting that Klinko was not an acceptable medical source, and that at the time Klinko prepared the report she had only met with Plaintiff three times, and that there was nothing in the treatment notes to support the opinion.[27]  The ALJ further noted that Klinko's statement that Plaintiff would miss three or more days of work per month was "purely conjectural" and inconsistent both with Momot-Baker's opinion and with other evidence of record.

Plaintiff contends that the ALJ's determination must be reversed because it contains legal error and is not supported by substantial evidence.  In particular, Plaintiff contends that the ALJ improperly substituted his own lay medical opinion in place of the medical opinions of record, all of which indicated that Plaintiff would have some degree of difficulty in maintaining

---

[27] Klinko's report indicates that it was based on seeing Plaintiff only during the month of July, 2018. Administrative Transcript at p. 396.

regular attendance at work: "There are five opinions in this case and each and every one assesses some degree of limitation to maintaining attendance.   Notwithstanding this fact, the ALJ improperly substitute[d] [his] judgment by not including <u>any</u> associated limitations in the RFC."[28]   Alternatively, Plaintiff maintains that to the extent that the RFC finding is based on the medical opinion of Momot-Baker and not on the ALJ's lay opinion, the ALJ nevertheless erred since Momot-Baker's opinion is too vague to constitute substantial evidence. Alternatively, Plaintiff contends that the ALJ erred by failing to expressly discuss the regulatory factors under 20 C.F.R. 404.1527(c) and to provide good reasons when weighing the medical opinions as required by *Estrella v. Berryhill*, 925 F.3d 90 (2d Cir. 2019).   Finally, Plaintiff states that the ALJ erred by failing to include all of her attendance-related limitations in his hypothetical questions to the VE, and that the VE's testimony therefore does not provide substantial evidence to support the RFC finding.

The Commissioner disputes Plaintiff's contentions and maintains that the ALJ's decision is free of legal error and supported by substantial evidence.

## DISCUSSION

<u>The ALJ Did Not Arbitrarily Substitute His Own
Opinion for Competent Medical Opinion</u>

Plaintiff contends that the ALJ improperly substituted his own lay opinion for competent medical opinion, which an ALJ clearly may not do. *See, e.g., Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("[T]he ALJ cannot arbitrarily substitute h[er] own judgment for competent medical opinion." *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d

---

[28] Pl. Memo of Law, ECF No. 7-1 at p. 13.

Cir. 1983).""). However, the Court does not agree that the ALJ did so. Rather, the ALJ expressly based his RFC finding on the medical opinions of record, especially the opinions of Momot-Baker and Slowik. Indeed, the ALJ generally agreed with Slowik's report, except insofar as it opined that Plaintiff would have moderate-to-marked limitations in maintaining a regular schedule and in dealing with stress. Accordingly, the Court disagrees with Plaintiff's contention that the ALJ relied on his own lay interpretation of the medical evidence.

Plaintiff nevertheless argues that the ALJ must have relied on his own lay interpretation of medical evidence, since all five of the opinions that he considered included some degree of limitation on Plaintiff's ability to maintain a regular schedule, while the RFC finding contains no such limitation. However, the Court again disagrees. Plaintiff's argument assumes that every component of an RFC finding must correlate to a particular medical opinion, which is not an accurate statement of the law. Rather, An ALJ is entitled to make an RFC finding that is consistent with the record as a whole, even if it does not perfectly match a particular medical opinion. *See, Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (Rejecting argument that ALJ had improperly substituted his medical judgment for expert opinion, stating that: "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also, Camille v. Colvin*, 652 F. App'x 25, 29 n. 5 (2d Cir. 2016) ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated additional limitations based on, inter alia, the testimony of Camille that she credited. An ALJ may accept parts of a doctor's opinion and reject others.") (citations omitted).

Moreover, contrary to what Plaintiff suggests, Momot-Baker did not indicate that her

14

opinion, that Plaintiff would be "moderately limited" in the broad category of "performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances," meant that Plaintiff would be off task more than five percent, or that she would miss more than one day of work per month.   Rather, Momot-Baker expressly stated that, "[a]lthough the claimant may have lapses in focus, motivation and reliability, the frequency, intensity and duration of these occurrences would not be expected to substantially detract from the claimant's ability to complete routine tasks at a reasonable pace."   As the Court read's Momot-Baker's report, Momot-Baker did not specifically indicate that Plaintiff would have any problem attending work on a regular basis.   What Momot-Baker indicated was that Plaintiff's limitations in that category related to her ability to "complete routine tasks at a reasonable rate," and as to that, Momot-Baker stated that such limitation would not substantially detract from Plaintiff's ability to complete simple routine tasks at a reasonable pace.   Consequently, the Court does not agree with Plaintiff's contention that Momot-Baker identified limitations that the ALJ failed to incorporate in the RFC finding.   The Court also disagrees with Plaintiff's contention that Momot-Baker's opinion was too vague to constitute substantial evidence.

<u>The ALJ Committed Procedural Error When Evaluating
the Medical Opinions, But He Nevertheless Provided
Good Reasons for the Weight That He Assigned</u>

Plaintiff's remaining contention is that after the ALJ decided to give less-than-controlling weight to the treating physician's opinions he failed to properly evaluate the weight that those opinions should be given, as required by 20 C.F.R. 404.1527(c) and cases such as *Estrella v.*

*Berryhill*, 925 F.3d 90 (2d Cir. 2019).[29]   On this point, Plaintiff states that she "does not contend that the ALJ must engage in a detailed analysis of every regulatory factor," but that, "the ALJ must address the most important factors and provide sufficient reasoning to permit meaningful judicial review."[30]   In this regard, Plaintiff is referring to the well-settled principle that,

> [w]hen assigning less than "controlling weight" to a treating physician's opinion, the ALJ must "explicitly consider" the four factors announced in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (internal quotation marks omitted). Those factors are "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* at 95–96 (citation omitted).   A reviewing court should remand for failure to consider explicitly the *Burgess* factors unless a searching review of the record shows that the ALJ has provided "good reasons" for its weight assessment. *Id.* at 96.

*Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x 23, 26 (2d Cir. 2019).   Put differently, an ALJ's failure to explicitly consider the *Burgess* factors when assigning less-than-controlling weight to a treating physician's opinion is a "procedural error" that will require remand, unless the ALJ provides sufficiently good reasons for his weight assignment that the court can conclude the substance of the treating physician rule was respected. *See, Estrella v. Berryhill*, 925 F.3d at 96 ("An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two

---

[29] Proper evaluation of a treating physician's opinion is a two-step process in which the ALJ must first decide whether to give controlling weight to the opinion and, if not, then must determine the amount of weight to give the opinion. *See, Estrella v. Berryhill*, 925 F.3d at 95 ("Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion. First, the ALJ must decide whether the opinion is entitled to controlling weight. . . . Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it.").   The ALJ's decision at both steps must be supported by substantial evidence. *Id.* at 96.
[30] Pl. Reply, ECF No. 12 at p. 2, n. 1.

is a procedural error.   If the Commissioner has not otherwise provided 'good reasons' for its weight assignment, we are unable to conclude that the error was harmless and consequently remand for the ALJ to comprehensively set forth [his or her] reasons. If, however, a searching review of the record assures us that the substance of the treating physician rule was not traversed, we will affirm.") (citation and internal quotation marks omitted).

These principles apply here, since the ALJ gave less-than-controlling weight to the opinions of two treating physicians, Stryker and Neerukonda.   Indeed, the ALJ gave "little weight" to both opinions, as well as to the opinion of Klinko, an "other source" treating therapist.   Instead, the ALJ gave greater weight to the opinions of Momot-Baker, who never examined Plaintiff, and Slowik, who examined Plaintiff once.   As a general rule, an ALJ should not give more weight to the opinion of a non-examining- or one-time-examining-consultant doctor than to the opinion of a treating doctor, particularly in cases such as this involving mental illness. *See, Estrella v. Berryhill*, 925 F.3d at 98 ("We have frequently cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.   This concern is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health.") (citation and internal quotation marks omitted).

When evaluating the opinion evidence here, the ALJ indicated that he had "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527."   However, the ALJ clearly failed to expressly consider the *Burgess* factors when evaluating the opinions of Stryker and Neerukonda.   Consequently, the ALJ committed a procedural error. Nevertheless, the Court finds that the ALJ provided good reasons for the weight he assigned

to the opinions, such that the purpose of the treating physician rule was accomplished.

As a preliminary matter, the Court observes that unlike in *Estrella*, here the ALJ cannot be said to have "cherry-picked" from the record. The Court has carefully reviewed the record and finds that it is accurately summarized in the ALJ's decision.

Turning to the opinions of Stryker, Neerukonda and Klinko, the Court notes that each of those treatment sources indicated that Plaintiff had either marked or extreme limitations in many areas of mental functioning. In this regard, however, it appears that the treatment sources accepted what Plaintiff told them at face value, and then relied on those statements to complete the functional capacity reports, even though their own observations of Plaintiff had been largely unremarkable. However, this was a case that turned largely on credibility. The ALJ, who was required to assess Plaintiff's credibility, found, based on evidence which those doctors did not have, that Plaintiff was not entirely credible, and that finding is supported by substantial evidence. In the Court's view, the ALJ's credibility finding informed his decision to afford less weight to the medical opinions insofar as they appear to be based solely on what Plaintiff reported about herself, when such statements were inconsistent with the other evidence.

The ALJ stated that he gave little weight to Stryker's opinion, since it had "no support in Dr. Stryker's treating notes." In that regard, the ALJ indicated that Stryker's notes reported that on one occasion, shortly after Plaintiff was arrested in 2017, Plaintiff appeared very anxious and tearful at an office visit, but that otherwise they show "completely unremarkable" mental status examinations. The ALJ therefore indicated that Stryker's opinion, that Plaintiff would be absent from work three days per month, was "purely speculative." The ALJ's

description of Stryker's notes is accurate, and therefore the Court finds that the ALJ provided a sufficiently good explanation for the weight he assigned to the opinion.

As for Neerukonda, the ALJ gave "little weight" to his opinion, finding that there was "nothing of record to support the opinion," including no indication that Neerukonda had ever examined Plaintiff. Additionally, the ALJ indicated that Neerukonda's opinion was inconsistent both with Momot-Baker's opinion and with the treatment records. The Court again finds that the ALJ's statement is accurate, and that he therefore provided a good explanation for the weight that he gave to Neerukonda's opinion. In that regard, Neerukonda's report indicates that it was based upon seeing Plaintiff on one occasion, June 19, 2018 (though the record contains no office note from such a visit), and that the report was written three months later.[31] This is consistent with an office note by Klinko on July 27, 2018, in which Plaintiff reportedly stated that she had met with Neerukonda only once, and had felt that Neerukonda had not listened to her.[32]

Finally, as for therapist Klinko, the ALJ also gave her opinion only little weight, observing that she was not an acceptable medical source, that Klinko had only met with Plaintiff three times, and that there was nothing in Klinko's treatment notes to support her opinion.[33] The ALJ further noted that Klinko's statement that Plaintiff would miss three or more days of work per month was "purely conjectural" and inconsistent both with Momot-Baker's opinion and with other evidence of record. The Court again finds that the ALJ

---

[31] Administrative Transcript at p. 560.
[32] Administrative Transcript at p. 399.
[33] Klinko's report indicates that it was based on seeing Plaintiff only during the month of July, 2018. Administrative Transcript at p. 396.

accurately described the record and gave good reasons for the weight he assigned.   In that regard, the record indicates that Plaintiff first met with Klinko on July 2, 2018, and that she met with Klinko only four times, all in July 2018, during which Plaintiff discussed emotional difficulties dealing with family situations. During those sessions, Plaintiff reportedly told Klinko that she had retired in 2015,[34]  which is inaccurate, and that she did not experience hallucinations.[35]

In sum, while the ALJ committed procedural error by failing to expressly consider the *Burgess* factors, remand is not warranted since the ALJ otherwise gave good reasons for the weight that he assigned to the medical opinions.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (ECF No. 7) is denied, Defendant's cross-motion (ECF No. 11) for the same relief is granted, and this matter is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
September 17, 2020

ENTER:

 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[34] Administrative Transcript at p 400.
[35] Administrative Transcript at pp. 394-397.